The attorneys who are going to argue the case, please approach the bench, identify yourselves, and who you represent, and inform us of how much time you would like to argue your case. The microphone is for recording purposes, not amplification. Thank you, Your Honor. John Moynihan, I represent Lakeshore Centre Holdings, LLC, and I will be conducting the argument in 15 minutes, Your Honor. Very well. Good morning, Your Honor. Mark Smith on behalf of the defendants, the alcoholics in this case. I will be arguing in 15 minutes, if it's more than sufficient. Very well. Mr. Moynihan. Yes, please, Your Honor. This case is about an option between LHC Loan and Lakeshore Centre. Lakeshore Centre is effectively a family business. They have other owners, and they're involved in health clubs, and they got financial difficulties in the Lincoln Park Club and ended up selling off two-thirds of it to LHC Investment, which is run by the individual defendants, for $6.5 million. The next summer, they got into financial difficulties about their Chicago Downtown Club and needed to borrow money. They were looking to borrow money from, again, what I'll refer to as the Goldman Group. They set out to do that. Near the end of that, they changed it to a sale with the right to repurchase. And that's the transaction that went forward. The sale was for $334,000, and we're here about the right to repurchase the option. The contract is formed by an offer and acceptance, and an option is no different. But an option is, under Illinois law, is an agreement for the option owner to hold open an offer to enter into a contract. And then if the optionee accepts, you have the contract. Here, there's no question as to what the terms of the executive contract were, because that contract was attached with Exhibit B to the purchase agreement. So we had LHC loan agreeing to open its offer to enter into Exhibit B to enable Glacier to repurchase its membership interest in LHC operating. I'm going to get confused with this. I'm going to call it operating the actual. I'm just going to call it the Lincoln Park Club. On June 28th of 2012, two days before the expiration of the option, Glacier sends notice to Mr. Goldman and LHC Loans Counselor that they're exercising the option and includes an executed copy of Exhibit B, changing it to eliminate the different price that had been exercised earlier, and filling in the only open item on Exhibit B, which was when is the closing going to take place. And Glacier suggested a closing of June 30th of 2012. It's uncontested that Glacier provided the notice and included Exhibit B. It's uncontested that LHC Loans never agreed to have a closing on June 30th, never agreed to the proposed Exhibit B filled out by Glacier, and never signed the contract as well. But the legal issue is whether the cash had to accompany what you said that price. Absolutely. That, I believe, is actually in terms of the breached contract. This aspect of the breached contract is 100% the issue. It is, was the payment of the purchase price a term of exercise, a precondition of exercise, or was it a term of possession? And wasn't that ruling made against you in the trial court in 2015 never appealed, and that claim never again appears as such in your Second Amendment? No, that is incorrect, Your Honor. Why is that incorrect? That decision was made and we were granted leave to amend the complaint, and we did. And my question is, where is that claim in your Second Amendment, the operable complaint that's before us at this point? I think that is count two, Your Honor, I believe. I don't have a copy of the complaint in front of me. I believe it's count three, to the extent it's anything. Because count two, I believe, is an official breach, but let me just be clear. I thought it was reversed, Your Honor. I'm sorry. So count one is fraudulent inducement, count two is breach of contract by changing operating agreement, and count three is breach of contract. Now, my question is, my real question is, how does this count three differ from the count that was in which summary judgment was entered against you in 2015? Well, the count, the summary, the complaint that issued for the summary judgment and the prior summary judgment, Exhibit B was not addressed at all in either of any of the complaints until the final complaint. Your initial complaint, then your amended complaint. And you argued for summary judgment on your initial and amended complaint, saying, we performed on June 28th, 29th, 30th, we performed. Yes, sir. Judge Schneider ruled that you did not perform, correct? Yes, I did. He granted summary judgment in favor of the defendants on that issue. You did not perform. You did not re-plead at count one in any subsequent pleading. You didn't. I read it. Your count three in your second amended complaint deals with... You advised them that you wanted to exercise the option. The defendants indicated that Goldman needed to approve your lender as an owner of the interest ultimately, correct? You then say by relying on the 2012 amendments to the operating agreement, that precluded you from exercising the option. Okay? That's what you say here. But here's the important thing to me. I'm sorry, which complaint are you looking at, sir? Count three of your second amended complaint. Then you say, given the defendants' interference with the loan on June 29th, meaning that they had to approve the subsequent transfer, plaintiff tendered a cashier's check for $425,000 to Loans Counsel, but conditioned on Goldman's approval of the transfer of plaintiff's interest to a new entity and the lender's approval of defendant's position. Now, you're conditioning your tender of the money in your exercise of the option. In your complaint, you're saying we conditioned that upon Goldman approving of my lender being a member of the LLC after the loan transaction takes place. Yeah, I think these are two different counts. We had a motion for leave to amend that Judge Schneider denied. I'm sorry, she is out of appeal? Yes, you are. Our motion for leave to amend is out of appeal. Judge Schneider denied that. That added Exhibit B, and it added the arguments related to Exhibit B. The final complaint that was dismissed on summary judgment, count two specifically addresses Exhibit B and the purpose of it. Okay. Your count two of your second amended complaint is breach of contract against loan. Loan voted to change the operating agreement to eliminate minority approval. Now, this is your count two. This is what you're saying. The operating could not have been amended without loan voting to approve the amendment. The change in the amendment, the change in the operating agreement, controlling plaintiff's interest in loan, could not return plaintiff's interest as it agreed to in the contract. But I have them back.  You're arguing that Judge Schneider's refusal to allow you to file a third amended complaint is before. I do not believe there's any argument on that in your briefs. I mean, it was part of the order. You're correct. It was identified in the notice of the issue, and the reason is because the principal issue is the summary judgment, and if we are reversed, a common issue. But if we're not reversed, and the issue is because of Exhibit B. What is Exhibit B, I'm sorry? The purchase agreement. Okay, so the purchase agreement of Paragraph 4, or Paragraph 3, creates the right to repurchase. So you have the right to repurchase for $422,000 by June 30th. Paragraph 4 says, of the purchase agreement, says, if plaintiff exercises, then the purchase is going to be completed by parties by Exhibit B. So Exhibit B, to the complaint, which is part of our last complaint, and it was argued on summary judgment, the issue, Exhibit B is the contract that L.H.C. Long agreed to hold the offer to enter into that contract open, and that's the contract that we accepted on June 28th, and we gave the acceptance, and we attached to that a copy of Exhibit B. Did you condition the tender of the $400,000 and some thousand dollars? Did you condition that acceptance? In the offer, the acceptance, no. Well, you pled it. You took plaintiff's tender, the cashier's check, and the actual price of $422,510, the loans canceled, but conditioned on Goldman's approval of the transfer of plaintiff's interest to plaintiff's new entity and the lender's approval of defendant's position. You're pleading that you condition your exercise of the action in the tender of the money, and those two conditions. Yeah, I don't believe that. I believe the issue on exercise is, and this goes back to the Willis-Clerk's decision in Gerda and the Supreme Court's decision in the Ross v. Jackson case. Performance or payment is not a term of acceptance. Generally, payment is a term of performance. When we accept the offer and we tender Exhibit B, signed, that is accepting the contract. And then whether or not we paid, whether or not we conditioned payment, that all relates to performance of the underlying contract that we never got to because they never allowed us to have the closing. We understand that, but our concern is that you were damned in that claim because that claim does not appear in your second amended complaint. The claim, all we had to do was give them the purchase agreement. We did not have to give them the money until the closing. We did everything we were supposed to do. That claim, we understand that claim. We understand that it depended on Gerda. We understand that you argued it extensively in your brief. Our concern is it's not in your offering complaint. It was in your first complaint, but it's not in your second amended complaint. And that is a serious concern of ours. I'll have to look at it. I don't have it in front of me. I do know that at the same time that the branch of summary judgment advances, the only time that was an issue was as to the, and I don't remember this, this is in the fall. It was the one prior to the final branch of summary judgment. And I specifically moved the court for leave to amend to address that, and the court said no. You wanted to file a third amended complaint, and he said no. And then we did file a third amended complaint because he granted us leave on the fraud, and I did file it, and those allegations are in related to the fraud. And count two in the final complaint absolutely addresses, count three in the final complaint addresses the argument that we accepted. On summary judgment, we accepted. We put in evidence that we accepted the offer. And if payment is not a term, if it's not a precondition, which if you look at the Gurdon case and the case that it stands to as an exception to the general rule, that payment is not a term of performance, then the action case, the language in the action case, and the action court even acknowledges that payment is there a term, a requirement of exercise because the action expressly states payment of the cashier's or bank check is due. In our case, there is not that language. You cannot read paragraph three as we do. Would you agree that you said you were exercising the action? Here's the money, but it's conditioned on your approval of the new entity of being a member of the LLC? I do not believe that the exercise was conditioned. No, the exercise occurred on June 28th. Okay. And when we sent the letter and we sent the contact and the e-mail, the letter with the condition is done on June 29th. It has no effect on what you did? No, that doesn't because on June 28th we accept it. Additionally, that letter, that June 29th letter has to be understood. So LLC1 is required to maintain the ability to enter into the contract. What did they do that indicated they would not enter into the contract? On June 29th, when we said we are exercising, June 28th and June 29th, they sent themselves e-mails. They said specifically, you have to confirm that you haven't transferred or encumbered the interest and are not going to transfer or encumber interest. They changed the terms of the action. They changed it on June 29th when they said, you can only do it if you agree you're not going to sell or encumber. And there is nothing in the purchase agreement or the action term that so restricts our ability to transfer or encumber. Did they change the operating agreement to restrict your right to transfer? The operating agreement in the interest that we sold did not. Not in the 2010 agreement, but in the 2012 agreement. I just don't understand. So the 28th, you give them the purchase agreement, the repurchase agreement. Yes, Your Honor. They don't have the conversations. And they say, whoa, whoa, whoa. Just know that you can't transfer your interest as part of this. Just be clear on that. And you're like, okay, well, given that, here's our cashier's check. But hold it until we get the management approval that you now tell us we need. Exactly. This is our negotiation. Third time we work on the 29th. We exercise on the 28th. Unequivocally, we exercise. Consistent with what we're supposed to do. We give them a copy of the purchase agreement. And on the 29th, in the conversations, Mr. Slaughter's e-mails, unequivocally, he states, the first one is, hey, 7-plus-2 doesn't allow you to transfer it. And then the second one says, you've got to confirm. And the first one says, the manager's not around. And the second one, you've got to confirm that you're not going to transfer without manager approval. Right. But under the actual agreement, that is not, there is not that limitation on it. But there's a limitation in the 2012 operating agreement. And that would be a breach of our, if we did that, that would be a breach after we acquired it. The condition Mr. Slaughter is we can't discuss. Let me answer this question. Yes, sir. Why did operating, why were they restricted in amending their operating agreement? Under the operating agreement, the LLC investment and LLC loan are not. But because there is an option that is going to be, that LLC loan agrees, we are going to return what you gave us. Well, what Operation did was set up contractual rights contained in an operating agreement. They gave you an option to purchase. We purchased 34% interest in operating. And the interest is controlled by the operating agreement that controls the rights between the party and the company. And that's what they agreed to return to us. Yes. Is that anywhere in the purchase contract? Is there anything in the option agreement that says that? That they could not change the 2010 operating agreement? Under the option law, they have to agree, they have to maintain a position to do it. And it is my position that because of the operating agreement, it's contractual rights. They're changing the contractual rights we gave them. They agreed to return to us what we gave them. And they're changing those rights. And there's no question that they're changing those rights. Those rights are minority rights, but there's no reason to change other than to eliminate our ability to enforce them. We were not getting back what we gave. Unequivocally, we were not. What authority do you have for the proposition that an LLC has no authority to change its operating agreement at all once an option is given by a member to repurchase an interest that he sold? Where's the authority? It's not the LLC. It's LLC won't agree to do it. And as we've said already. Where does a loan agree that they would not change or vote to change the operating agreement? Where is that written? Under option law, they have to, when they agree that they're going to return, that they're going to sell us something, they have to give us the same rights. It's just a case that supports that position. Yes. It's just a case. Specifically, is that an LLC or not? We believe it's not. This isn't your first impression. I acknowledge that. But in the Morris Bedford case, and this was the only Supreme Court, it explicitly stated when there was an agreement, the option was to transfer a piece of property. And they tried to transfer it pursuant to, it was supposed to be pretty simple, and they wanted to do it once, indeed. And the court said, no, because you're giving them lesser rights than you agreed to give them. And here, when they're saying you're going to return to us, the rights, the contractual rights they're returning to us are not. An LLC is control-side operating. Those are contractual rights. We gave them the rights. You sold them a horse and they gave you back a cow. I mean, that's basically what you're saying. It changed so much that it wasn't the same thing you sold them. And the thing is, this isn't the situation that LAC 1 puts in the argument that, oh, we should be able, of course we can change employees. Of course we can buy assets. Of course we can do this. I don't think that's the question. What they can and can't do. And the line-runner would be, absolutely. If there are contractual rights that we as the minority members have, and you eliminate those rights, that's different than the company operating. Okay. So, looking to the change between 2010 and 2012 operating agreement, one thing you have is they just can't do it If I understand you, you're also making a second argument, which is, they then rely on that change to interfere with our ability to perform under the re-purchase agreement. They obstructed our performance. That's how I read your account. We did perform to the extent we could and to the extent we didn't. It's their fault because of everything that happened on June 29th and the change in the operating agreement. The uncontested evidence on June 29th is, our counsel, the ratio's counsel, Austin Hirsch, contacted LHC Loans Counsel, and they have a conversation that in Austin... And that's just what you learned at the 2012 operating agreement. No, it's a little bit different. I think they learned earlier on the 29th because Mr. Slott, this is Mr. Everett Ward. This is at the end of the day on the 29th. It's the confirmation email. Right. And it says specifically, okay, we can't give you or we can't get the managers to approve that for anything. LHC Loans transferring it to us or us transferring it, if that's what we need to do for the financing. We can't do that. And they agree that in the contested evidence, because they don't put any evidence contrary, is that we, that LHC Loans says, yes, when Mr. Goldman gets back into town, we will complete the transactions. So at a minimum, in terms of their motion for some adjustment, that's a contested fact that they changed and they agreed. If you are requiring payments, if you read the... Mr. Greenberg, Mr. Greenberg is saying it can't be changed to something, right? Well, I think we would have to look at the purchase agreement, not the repurchase agreement. Right. Right. But if you have the documentation on it and they're saying it, it creates a question of fact. And I think that question of fact alone is to prove summary judgment because it has to... Even if payment is required, there's nothing that indicates payment is required on June 30th. Not one thing that indicates that payment is required. And the court's interpretation of the language that rights to repurchase before 22, you can't say that that type of payment when it's in the defense, the purchase shall occur at closing. The purchase shall occur at closing. So there is no obligation to pay that date. And we have a situation where the LHC, where ratio is in a position where those fail, we can't confirm that you have it. And we're using 7.2 specifically. If they don't accept the 7.2, there is no approval we need. We can transfer it. It's only because they change it and then we rely on that change. Did the original 2010 operating agreement provide for manager approval of any transfer? No. 100% not. 7.1 specifically recognizes that there has been an absentee. There is no requirement for a transfer to an absentee. But they're not a manager. So we thought the requirement would be that absentee for them to be able to become a substitute member would have to get manager approval. That does not limit our ability to either A, transfer it, or B, project. Two things which we had the ability to do, which we did under the 2010 operating agreement, we would have never had the situation on the 29th regarding the payment and regarding 5.1 because we would have done it ourselves. We didn't need their approval under 2010. It's just because they inject that and Mr. Swano makes it perfectly clear. You cannot do this. You cannot do this unless you get manager approval. You have to comply with that. So we're trying to mitigate our damages because they are now relying on a term to say you can't do what you're going to do. And that's what the payment, that's what the whole thing, the letter on June 29th is. If I have to mitigate because they've injected the thing, you've got to get manager approval and you can't get manager approval because he's out of the country. Therefore, LSU loan can't transfer it. We've never had a closure where we're required to pay. And the only contract that we accepted, we gave them the exact contract that they agreed to or want for, that they'll be offering. We signed it in some way. It seems to me that your client needed a loan to exercise the action. Correct? I think that the plan was to get the payment through. No, it was actually a more complicated transaction. Essentially, he needed to borrow the money. The person or entity from whom he was borrowing the money said, I'll give you the money, but I want to be the owner or holder of the 34%. No, Your Honor, that's 100% inaccurate. They were what? What did they want in the 34%? They were the pound and ound transaction. Yeah, what did they want? Initially, it was just – What did they want? I know that's what I'm trying to answer, Your Honor. Initially, it would be Lakeshore is exercising the action and they own the interest. What is that? Lakeshore. And then Lakeshore transfers the interest to Collins and Elm. Collins and Elm, over time, depending on whether Lakeshore or whether Collins and – so the property would be in Lakeshore's hands now, or Collins and Elm's. Collins and Elm – How do they have it in their hands? As S&E? As owner? Collins and Elm? Yes. Collins and Elm, the 34% interest would be transferred from Lakeshore, pursuant to after it exercised the action, to Collins and Elm. So Collins and Elm now is the 34% owner of the interest? Correct. So there was a transfer of the member's interest, correct? That is an assignment of the interest that was paid. It's not making them a substitute member. Well, are you saying then that the manager of operating in 2012, under the 2012 operating agreement, did not have the right to approve that transaction? I'm sorry, under which operating agreement? If your client had gotten the money, obtained the 34%, and then transferred the interest to Collins and Elm, are you saying that the manager of operating had no authority, no right to approve that transaction? Under the 2012 operating agreement, that transfer would have been void, absent the manager's approval. Under the 2010 operating agreement, the manager would have had no role in that transfer. Okay. And then the other thing is that Collins and Elm was going to be owned 100% by Lakeshore. It was only if Lakeshore did not repay the funds to the lender that the lender would get any kind of ownership interest in Collins and Elm. And totally avoid the 2012 operating agreement that says the manager has to approve that transfer. I'm sorry, I didn't understand you. The 2012 operating agreement gave the manager the right to approve that transfer. Yes, sir. Okay. All right. But you didn't know, if I understand it right, you didn't know anything about the 2012 operating agreement until either June 28th or 29th. I think the morning of June 29th when Mr. Slaughter was saying, hey, I think it was June 29th because that's when he was saying, hey, 7.2. They're going to be doing a crutch. And it's not just a transfer. It's also a crutch. And so now they're using the changes that they input to the membership agreement that we gave them that they're supposed to return to us and using that to say, you can't do the transfer. And so it's our effort to address the change that they input. And that's the whole thing. But again, under Illinois law, under Fairbairn and Welsh, we exercised. And once we exercised, now we go to performance. And the problem is we never get to performance because they refuse to set the closing. But when you say they refuse to set the closing, I think Mr. Voss or Voss was at the health club on the last day waiting for instructions on how he can cash this $400,000 check. He never got those instructions. I don't think he was waiting for how he can cash the $400,000 check. He's sitting there. I understand. Did he ever get instructions on what to do with the check? No, he did not. Okay. Did he ever get any communication from your client after that date for the next two weeks? I don't know relative to instructions because we're waiting on Mr. Goldman. But the issue is before he went there, before, on the evening of June 29th, LEC Law's counsel said we can't do a closing because Peter Goldman's not in town. So where is it that we would have a closing on June 29th? The only time there was an issue about a closing on June 29th is we sent them a document. And the unconfessed evidence is they never signed that document. And the unconfessed evidence is they never agreed to a closing on June 30th. And the reason they can't do a closing on June 30th is because Mr. Goldman needs to be there. That's what they told us. But the bottom line is, again, we need to be there. Because the way you structured it, you need his approval for the transfer of the pledges. No, no, no, no. Mr. Goldman always needs to be there. Mr. Goldman needs to be there to enable a transfer of the interest from LEC Loan to Lakeshore. That's not going to do it. I would just say they said, too, we can't close without Mr. Goldman in town. That's what all the other references, the other representation did, and the June 29th e-mail at the end of the day between Austin Hirsch and Everett Ward. Absolutely. We can't do that. So if you decide to hold transfer of your interest to Elm and, sorry, what are they called? Collins and Elm. Collins and Elm. Collins and Elm. Please, that decides, even without that problem, you couldn't have closed without Mr. Goldman in town? Is that your position? Yes, because LEC Loan has to do an assignment as part of the closing. And LEC Loan doesn't have authority to do a transfer because Mr. Goldman is not in town. Okay. Do you have anything else you want to hit on? No, sir. I guess the one thing would be in terms of the fraud. The whole case is about promissory fraud. The whole fraud is about promissory fraud in that they never intended to honor the agreement. They never intended to honor the option. And we put in evidence that 100% is circumstantial because that's how you always have to prove fraud. We didn't deliver any facts. It was all surmise, right? Well, we arrest facts from which you would draw inferences. We have no direct facts, Your Honor. It's all circumstantial evidence. And from those inferences, we believe that there is sufficient to get to the jury that LEC Loan never intended to honor. I mean, if you just look at the changes to the operating agreement. At that point in time, you have LHC Investment and LHC Loan owning LHC Operating. And the changes that they're making are to remove the motive protections that there's no reason to do. Nothing happened before December of 2011, right? No, that's incorrect, Your Honor. The other aspect of the transaction related to 1320 Fullerton LLC, which was the exercise. The exercise of the action gave you two dates that you could exercise, December and June. Yes, sir. Up until December, they didn't amend the operating agreement. They did nothing to indicate that they weren't going to go through with the option agreement, right? The amendment to the option agreement was in January 2012. I would disagree that they did nothing. As to 1320, which was an aspect of the transaction, LHC's ownership interest in 1320, which owned the real estate that the Lincoln Park Club was on. LHC continues to be a member of that. And beginning in June of 2011, immediately upon the transaction, they stopped treating LHC as an owner of that entity. Well, that has nothing to do with the exercise of this option. It's a subject matter of this lawsuit. It definitely does because it is the identification of the basis for entering into the transaction in the first place. And the fraud claim relates to that they never intended to do that. And the evidence of their treating LHC as not an owner of 1320 in July of 2011, immediately upon entry into the purchase agreement. So a year before the option exercise. So in July of 2011, they began treating the other aspect of the transaction as having no bearing. And they started treating LHC as not being a member of 1320. And so I do believe that at the outset, before the action exercise becomes an issue, there is evidence that would support drawing an inference, a jury drawing an inference, that they never intended to allow LHC to exercise the option. I recall you saying primary judgment should have been granted to them. It was not a primary judgment, Your Honor. It was actually a motion to dismiss. That you did not let them. And so that was actually only a motion. There are arguments that realize that there was a misrepresentation that the purchase agreements were wrong. We believe falsehoodedly that that representation is accurate. We believe that the purchase agreement, if they actually intended to allow us to have the option, did not really occur in the loan transaction. That's not a fraud underlying the fraud. It's just simply the commentary that they never intended to allow us to repurchase the interest through the option. Thank you for your time tonight. Thank you. Thank you. Mr. Schmidt. Plaintiff spent five years trying to blame the defendants for promising they would do the one thing that they needed to do. In order to exercise the option, plaintiff had to pay various amounts of money within various periods of time within the end date of June 30, 2012. Plaintiff didn't do that. And instead, they filed this action, and they're blaming us under theories of breach of contract and fraud. Under breach of contract, they claim that we anticipatorily repudiated the contract, merely by changing the operating agreement. They also claim that they somehow actually performed, merely by sending over the purchase agreement. With respect to the anticipatory repudiation argument, duty, breach, causation, damages, those are the four hallmarks of any breach of contract action. But there is no duty as a claim of claims in this case under the option. The only duty LAC loan had was if, I do have a duty of good faith and fair dealing to do that, and there is a claim, is there not, that if you stand in the way of their ability to perform, then you've breached. The duty of good faith and fair dealing was never used to impose obligations that don't exist in the contract. I understand. Then, well, in case you've got an ability to go one of two ways, you should go the way that's in good faith. That's not what happened in this case. What happened in this case is we changed an operating agreement, not knowing that Plankett was going to have a lender, but the lender was going to require that Plankett transfer the interest to a third-party company, and the third-party company was there so that Plankett's patent was no longer reaching the interest. Right. But as soon as they come and say, hey, we want to exercise our repurchase rights, you're like, no, no, no, you know we changed that operating agreement, and you know there's going to be limitations on what you can do, and we've got to wait until our managing partner's back in town. That all did happen, right? Some of that happened, but not quite that way. A, we didn't need the managing, what they called the managing partner to be in town. Any of the three individual defendants could have signed whatever was necessary. To transfer their interest back, yeah. Well, to transfer, if you're talking about transferring the interest back to L.A.T. Law, what's interesting is the purchase agreement. Free speculation, right? Yeah. Okay. The purchase agreement says in paragraph three, you also have the option by repurchasing, paying the money, because they don't know how they're going to repurchase it. And you can pay the money. And just like a repurchase, you're paying the money. I'll go into a hot dog place, but I'll have to have the time to purchase a hot dog without paying for it. So, once they pay it, paragraph four then sets out the remaining sequence of timing. First they pay, then we do the ministerial acts, including signing the purchase agreement. The plaintiff wants you to do is essentially rewrite the contract to provide that payment comes after the purchase agreement. This is not what this agreement says. It's not what they agreed to. And the courts have to then resist and rather edit these insights. Not only interpret the contract as written and not on additional terms, but give it each term meaning. The only way we do that in this case is to accept our standards analysis, which is first you pay, then you do the ministerial acts. Nothing that we did, even to the operating agreement, even assuming that we didn't have the right to do so, which we did, prevented them from doing the one thing they needed to do, which was pay. Okay. But I think you and I both cite an analogy. There is a case law out there that says, and I'm now reading from your brief, citing dying, that when a condition, and you're saying the condition of them paying is particularly within your power because their ability to pay was contingent on your approval of them doing the transfer. They said, hey, we need to be able to do this transfer for us to pay you the $334,000. That's what this conversation on the 29th. You realize they couldn't pay you unless they could transfer the interest. They made that clear on the 29th. Did they not? They did. But why would we have to accept some new number? So what they did is they conditioned the exercise of the option. Okay. Even if you accept their proposition that by tendering the purchase agreement, that was the exercise. No, I'm saying, I'm taking your position. Paying the money was what they needed to do. That was part of what they needed to do. But it was conditioned on an obligation that we did not have. I understand it. But they said, we want to pay you the money. We want to repurchase. But the thing is, in order to do that, we're going to have to make a transfer. And you're like, no, no, no, no, no. You can't do that without our approval. Correct. Why did we need to approve? I'm not expecting you to agree with this, but their argument is you needed to approve because without your approval, we couldn't do what we needed to do to repurchase. And you knew that. No, we didn't. I mean, that was the first of all. Yeah, you did. Yes. And you're trying to make them say, we need your approval to get financing to do this. Right. And we need to put this interest, we have to reach out to our partners and put it into their hands. You can't do all that. And you said, you can't do all that because we amended the operating agreement. You can't do all that without our approval, and we can't give it to you until Mr. Goldman Goldman. Goldman is back in the cap. Our approval for the transfer that they actually required in this case was necessary under the 2010 operating agreement. Was it? Yeah. How come? Because it says. It says to be a member, you need approval. Why? Because that's what 10-person lending required. They wanted to be the member. They wanted to be the member. College of Land and Health Investors wants to be the member. And their contract says, well, we're only going to have approval for a period of time, and we're going to be able to get it back. But College of Land and Health Investors, according to the two actual member guys, was required to hold the interest as a member. And that would have required approval under 2010. That would have required approval under 2010. We didn't change anything. Even if we changed. Nothing changed that requirement. It's not like they're saying, well, okay, we'll take a pledge. That's not what they were doing. They wanted to be the member. Correct. Okay. All right. Are they agreeing? Yes. Okay. All right. That's fine. Go ahead. What I think is interesting is, the point of this is actually arguing is that this is some kind of a ban. Because point of this comes from what I just told you. They expected to get it back in exactly the same condition whatever that may mean. But this is not a ban. This is not a really adamant object that fits their own change. And plaintiffs knew that we could change the operating agreement. They knew because they had this one fair operating agreement except for the circumstances under which it could be changed. They knew that it could be changed. Mr. Kaiser testified. And that's the other thing I've been thinking through doing. It's for circumstances that you couldn't anticipate. Mr. Kaiser testified that in his mind it was understood that he did not want the operating agreement changed while the option was open. The problem is, he never asked us, he never requested it, and it was not included in the purchase agreement. But what about a document that what you sell or what they tried to buy back from you was different than what they had told you? Okay. If you accept, well, if it's a 34% interest that we're obligated to sell back, they will not change. If it's 34% of the interest subject to the exact same operating agreement with the business in the exact same condition, I will grant you it is not. Do you agree it's an issue of first impression? No. Do you have a case that says it's fine? No. Do you have cases that say that you can do that? We have cases that say that courts don't impose extra contractual obligations. So I would say it's not an issue of first impression. If you get to the question of, well, did someone ever say that because you've got blue eyes versus green eyes that it's no longer applicable? No. But the other thing is, it's not just the situation, it's economic reality. Every day GM is out there issuing options. If you accept Tony's notion that you've got to do it, that while the option is open, your business and the company will have to stay in exactly the same position unchanged until the option is exercised or not, think about the option industry. It no longer exists. So you have a contract, a discussion, agreement, common sense or public policy that supports this notion that merely changing the operating agreement means that the interest cease to exist. The nature of an option is such, right, that you've got the ability to repurchase at some set time. So during that period, before the option comes through, you look at the business. If GM's stock is up, you exercise the option. If it's down, you don't. But what the courts don't do is impose extra contractual obligations merely because the plaintiff is unhappy with the deal they've got. Part of the second breach of contract argument is that it actually performed under the option agreement, merely by tendering the purchase agreement. As we discussed earlier, it's not. Taxes have the option. The tenant had a purchase in the interest. It's clear that it did. But even if you accept tenant's performance as just tendering the purchase agreement, it still did the one thing you can't do in exercising that option. It conditioned its performance. When they sent the purchase agreement over, they said, oh, give it escrow. The next day when they sent the check, they said, oh, this is escrow, and you need the approval of some third party authorizing the lease of the fence, and you've got to agree to the transfer. So even under tenders for it, they still conditioned exercising the option. And in some of the cases that have been discussed, like Acton, there's a great quote. It is elementary that when one party gives an option to another, the acceptance to be valid so as to conclude an agreement or contract between the parties must, in every respect, meet and correspond with the offer, rather than fall short of their goal beyond the terms proposed, but exactly mean that, at all costs, and closing with them just as they stand. So what does this do here? So you're saying even if they didn't have to come up with the cash, they conditioned their performance. Even under those very close conditions. They responded in an attempt to force land builder on asteroids that were at risk to perform properly under fraud claims. They got two types of fraud arrears. One is an actual misrepresentation, and the other is what Plano refers to as promissory fraud. Interestingly, Plano's counsel just said that what I thought was the misrepresentation of a ledge was not the misrepresentation of a liner. If you look at counts one and five of their complaint, it includes the allegation that defendants indicated that the sale and auction repurchase was the effective equivalent of what had previously been negotiated by Plano for LHCL, which was a loan that Plano's interest was collateral. There is no other representation set forth in the complaint. The same thing in count five. In this case, Plano announces that the individual defendants represented with the contract is roughly the equivalent of the loan transaction that the parties have been negotiating. To the extent that Plano is claiming that that's a misrepresentation, which is actionable, Judge Snyder found that it was not, because representations as to the legal effect of a document are not actionable as fraud. To the extent that Plano is trying to claim that there's some kind of promissory fraud, my first question is, what's the misrepresentation that underlies the promissory fraud? One of the things that plaintiff did, and its counsel did, is the last argument that was entered prior to this appeal was the dismissal of the fraud claim in a bystander's report. And in that bystander's report reflects counsel's acknowledgement that there were extra contractual representations, but the misrepresentations came in the purchase agreement itself. So we're back to this notion that the promissory fraud that plaintiff is claiming is predicated upon some, I guess, inability of ours to change the operating agreement, and that we did not intend to give them back the exact same interests because we changed the operating agreement. Now, the problem is with that. It requires, first of all, a representation. We never represented that we were not going to change the operating agreement. The issue simply never came up. Second, plaintiff's counsel's acknowledgement that there were no extra contractual representations, and the representation that we were not going to change the operating agreement is not in the contract. Third, you've got to assume that we knew at the time of contracting in 2011 that we weren't going to change the operating agreement. And fourth, you have to assume or acknowledge plaintiff's position in court that merely changing the operating agreement means the interests cease to exist. For the reasons we've discussed, that's not it. What the court is essentially doing is taking what it claims to be a breach of contract and recast it as fraud. And all they have is a failure in their mind to perform in accordance with the optional agreement. Let's go back for just a minute to the breach of contract. Yes. If on June 29th, and you know the record far better than I do, you said to them, you know, the way you want to structure this, we're not going to be able to do it with Mr. Goldman. Is that a thing? Goldman's? Goldman out of town. I think you know him. If you hear me from behind, come with me. You said to them, we can't do this with Mr. Goldman out of town, the way he's got the structure. Let's hold off on the closing until he gets back. Is that at least their version of what occurred on that? That's a breach. Yeah, I mean, that is somewhat their version of what happened. Okay, so if that's what occurred, why is that, why are you not in breach? You said, let's just hold this open. We're going to wait to see if Mr. Goldman will approve your transferring. If he does, we'll go ahead, and if he doesn't, we'll see where we are. First of all, I disagree with what they say was being confirmed. Okay? Okay, well, let's assume it's a fact that maybe that's what occurred. No, no, and actually it's not because Mr. Ward, the author of the e-mail, testified, and there was no contrary testimony, then what he confirmed was that they had a conversation. I understand. Correct. That's what they're saying in that conversation. You said, let's hold this open. I'm asking, this is a fact, can you modify it orally? Is there a problem if that's what happened? You said, let's wait and see what happens when Mr. Goldman gets back. A couple of things. Okay. First, we're a pre-amended component to this, and they've never claimed whether or a stopper. That's number one. Number two, as Justice Pierce noted, this is a fully integrated document, and this says, I believe it was Justice Pierce, that amendments have to be in writing signed by the parties. There is no amendment in writing signed by the parties. The point of that to establish, contrary to what the contract says, is that they have no influence which should overcome the contractual requirement. The contractual requirement being, in your mind, that there be an unconditional transfer of dollars before June 30th. If there's going to be an amendment to this, it has to be in writing and signed by the parties. If this was actually some kind of amendment that Frank had wanted, this extension, the parties in this case are represented by some pretty high-powered law firms. It would have been done completely differently. What Plano is trying to do is bootstrap its way into an argument that really doesn't exist. If they wanted this thing amended, do it, amend it, we'll see about it. Maybe they'll sign it, maybe they won't. But there are mechanisms under the contract for doing this. The same way that Nexus has the option by paying, the same way they didn't amend it. All they had to do to evaluate everything was what their counsel told them to do. It was one of the emails that's attached to the summary judgment motions. It was their counsel telling them, go there on June 30th. Now, they did tell them to check and ask for it again, but at least go there. They did it. There was no performance that was necessary. We believe that Judge Snyder got it right on granting summary judgment and on dismissing the fraud claims. Thank you. Thank you. Mr. Moynihan? A couple of things. First, the assertion that Collins and Elm required it to become a substitute member. Please note for the record, there is not one shred of evidence that Collins and Elm required it to be a substitute member. They wanted it to be an equitable member. There is not any evidence to support the statement. What's the difference? The difference is tremendous. The interest that would have been transferred if it had become a substitute member, that entitles them to get all of the payouts that they would receive, the 34%. The substitute member gives them the ability to participate in the vote and do the other, take the other actions, the right that a member has under the operating agreement. So they would have served an entitlement to the full economic benefit of the interest. Collins and Elm would have been. As an equitable member or a substitute member? Just as the absolute of the rights. If you want to look at something to clarify this, where in the record should we go? To clarify that Collins and Elm. Did not need to be a member. I can't tell you where to go because there is no evidence of it. Okay, but what did Collins and Elm, I assume it's in the interchange between the lawyers on June 29th, what Collins and Elm was expected to do. No, no, because Collins and Elm wasn't addressed with the other side. There would be a deposition, I believe, of Austin Hirsch. So that's where. And also, actually, more after Walter Kaiser's deposition. And he testified, you know, unequivocally, we're just doing a transfer to them. There is nothing to support the factual assertion made here that Collins and Elm, not actually Collins and Elm, the financiers who had a potential to become part owners of Collins and Elm demanded that Collins and Elm be a substitute member. The condition of the release of the money from ESSA was that the manager of the operating company, operating LLC, approve the entry of this other entity into the picture. Correct? Yes, Your Honor. Right? Yes. Thank you. So that is telling me that Lakeshore is saying you will not get the money unless you pre-approve a transfer that we anticipate will take place after Lakeshore repurchases the 37%, 34%. And we transfer it, right? We want you to pre-approve it. I understand that's your interpretation. I have a different interpretation. My interpretation is, under ANIY, set out by the ANI Supreme Court and set out by this court, is that payment is not a performance term. And therefore, when we accepted Agribit B, which the assertion was that we never indicated we accepted it, both in June 28 and in the repurchase agreement, we say we're exercising. Okay. Okay? So we have exercised. At that point in time, we have a contract. Okay. Okay? And performance as stated explicitly by GERDA. But isn't Mr. Smith right? Let's assume that's all true, and let's assume you're right. After all that, you say, oh, but there's a condition. So isn't he right on that? No. After you accept, but before they accept your acceptance, you say, oh, okay, it's a condition. Now we're going to exercise. We're just trying to get to a closing. Okay. We're trying to stop the closing of the merger. True. The way this is all set up, the $400,000 would not be released in payment of the purchase, the exercise of the action, unless the manager approved the subsequent anticipated transaction between Lakeshore and this college, correct? I do not know if there would have been payment at the closing, Your Honor. I don't. And you don't. Because that factor is not in evidence because we never had a closing. It was conditioned in the escrow, saying, here's the money, but hold it in escrow and don't release it until you tell us the manager's going to approve in the future our transfer of this interest into a new entity, right? There is that statement, but at that point in time, we're now talking about performance of the executory contract. They have a contractual right to force us to pay 422. Right. Unquivocally. Right. Once we exercise, we have a contract, and they have the ability to force us to pay the 422. That means there's no longer a condition of acceptance, and it's not a part of the action. The contract, the exhibit B now, should have been a contract. The problem was they would not agree to set a closing date to complete the transactions. But let me put it to you this way. Lakeshore says, here's the money, but you have to approve this anticipated transaction. I'm not going to give you the money unless you agree to that. And the manager says, I'm not agreeing to that. That would be a breach of the repurchase agreement. Why? That's a condition. No. No. Not because we're conditioning, because we're failing to pay. We agree to pay any repurchase agreement. Yes. Oh, absolutely. If we fail to pay, and we say we're not paying because of X, Y, or Z, after we tender, after we accept the offer, we have a repurchase agreement. The only question is, when's the closing going to be? And if we fail to pay them, that would be a breach of the repurchase agreement. It is not a failure to exercise the action. So your position is that if, on July 1st, Goldman returns from Europe and says, okay, let's close, you would have said, okay, here's the money, but approve this anticipated transaction. And he says no, then you would have been in breach if you didn't tender the money. Yes, absolutely, Your Honor. Okay. So when it's all said and done, isn't that where you are? No, because we would not have had a closing. They would require a repurchase agreement. They would require a saying if. You would not have had a closing if the manager never approved the anticipated transaction. Ever. We would have had a closing date set. We would have had a date set, and we should have paid. We wouldn't have paid, and therefore we would have been in breach. But we would have had a closing date. So June 1st is complete on June 28th. The exercise, the creation of the repurchase agreement is complete on June 28th when we come back. I just can't understand it. It's done. You signed it. Well, we've accepted their offer. In terms of the document itself, it's not a contract. Because they didn't. Because they didn't. Well, no, we accepted their offer. The purchase agreement we tendered is not a completed contract because we needed completion as to when the closing was to occur. That was the one term. We exercised. The whole thing was options, and so we can't change the terms. We don't change the terms of the agreement. We tendered a signed copy of exhibit B. We accepted the exact contract they offered to hold open, and we accepted it. If we didn't perform, that would be a different issue. But we accepted it. And the one thing they were doing was the only thing they had to do was set a closing date. Maybe we could have closed. But the other party who breached it, they refused to set a closing date. The additional issue that I think is on the surface, on the repudiation, the argument is about is it a first impression. There's no way to argue that if the contract says something that you can't interpret the terms. The whole question here is under the option law, if you have the way that the option is a membership agreement, and that membership agreement has contractual rights, can you change those contractual rights and still return the membership interest that you received? That's a question of first impression. I acknowledge it wholeheartedly. And then the issue is, well, let's look at GM. Let's look at GM. Absolutely. There's two critical differences here between an option on GM and this option. Number one, LHC won't unilaterally have the ability to make LHC operating agreement remain the same. They have the ability to stop any change to the operating agreement. A general person at GM, an editor, a director, one director, not one person has the ability. LHC won't unequivocally, only I think it's Section 10.2 of the operating agreement, to preclude any changes. So LHC won't have the ability to preclude it. And now let's look at it. If you take an option on GM and you're supposed to be a common stock and you want to change the option to preferred stock, you can't do it. You've got an option to receive the contractual rights that are contained by common stock, and those rights can't change. The operation of the company absolutely can change, but you can't change the rights that you agreed to tender to them. And that's what Judge Barkowitz acknowledged in his decision in his case, saying that this isn't a statutory repudiation. We're not bound by Judge Barkowitz's using of that argument. No, I'm not. What's the point? The point is that there's at least one other judge who agrees with me. The issue about, and this is a very good question about definitions of being ready, the problem with the arguments, okay, we don't have a written Exhibit B. We don't have a signed Exhibit B. Exhibit B is the definition of when performance and what performance is going to be. And so, yes, that can be changed, because the Exhibit B isn't signed by them. And so Exhibit B, one item that left open explicitly is when are we going to close? And we're trying to address that. And if we're saying, if you're saying, geez, can I put in these conditions, can we change when the closing is going to be, can we wait until after Mr. Goldman gets back, we don't in the- The purchase agreement has a June 31 closing date. No, no, no, no, no, that's the issue. That's my last point I want to get to. Okay. Exhibit B, and if you look at Exhibit 1, and I think I can actually tell you the specific- Where is Exhibit 1? Yes. It was Exhibit 1 through the summary judgment, and I don't have the SRO in my- Exhibit 1 through the summary judgment is the purchase agreement. The purchase agreement has Exhibit B attached. Any Exhibit B that the parties agreed to enter, it is identical to the repurchase agreement except for two things. One is, there are two separate places. One of them was exercised by December 11, one of them was exercised by June 30. So, NACCHO removes the December 31 information and uses the June 30 numbers. The other thing is, it explicitly states the closing shall be on date. It has a blank. Yeah. And that's the- But in Exhibit 1, it said closing by June 30. That's for the purchase agreement. I see. The purchase agreement had to close on June 30 of 2011. The repurchase agreement, in the Exhibit B attached to the purchase agreement, says the consummation of the transaction concentrated at this agreement shall occur at June 30, offices, on a date- I don't know if it's for a date, 2011 at 1.30 p.m. closing, or any other such time that the parties may agree. Okay? And so when we're talking about when the closing date is- It's not changing anything. It's the closing date. Yes. We're trying to set a closing date, and we're saying we'll do it when closing gets back. The last issue in terms of Exhibit B, because obviously Exhibit B is important in our group, in the summary judgment briefing, we put in all these arguments, and the judge's decision was about- he addressed specifically these arguments about Exhibit B and whether or not it was an acceptance. Okay? We had a motion for leave to amend the complaint, and the judge denied that motion. He granted it to amend the complaint as to the fraud counts. We amended it, including Exhibit B, because it relates to the fraud counts, and doing all of those, and specifically- and this is the third amendment complaint- and specifically in the briefing on the third amendment complaint, both parties agreed that the judge's determination, including the judge's Exhibit B, applied to the breach of contract counts. And that's why there's not a renewal of the summary judgment motion, because we worked out the court's decisions, including related to Exhibit B. But if you look at the third complaint, it addresses all of the issues about Exhibit B. Our summary judgment put in the facts. And the question is, and this is the one thing that- I'm just going to stop you for a second, so I understand. So there's the lengthy ruling that Judge Schneider issued on summary judgment on the contract. And the summary judgment was in 2015. I believe it was in 2016. There's one in 2015 that we don't have on your first complaint. On your second amendment complaint, we have, since your appendix to your brief, a lengthy opinion by Judge Schneider. And then there's a second ruling on the fraud claim, and that's the one that has the bystanders report. Is that correct? Yes. And it's on that. And that's where he addresses your fraud claims. And there is your third amendment complaint, not your second amendment complaint. We moved, before the summary judgment, in the spring of 2016, we moved for you to amend specifically because we did not have Exhibit B. And we obtained it in-actually, the defendants obtained it through discovery on Reed Smith. Once we obtained it, we said, okay, we have Exhibit B, and specifically the issue that you're expressing confusion about it, that's when we learned that the repurchase agreement Exhibit B, or Exhibit B in effect doesn't date on June 30th, but it's that date. And so we tried to amend the complaint. The judge, instead of having us amend the complaint, he just ruled based on our summary judgment arguments for that. And then we amended it. And the third amendment complaint is the, you know, that's the complaint. On the fraud. On the fraud. Right. That means that we agree that because we have already addressed the Exhibit B arguments in our summary judgment motion, everybody agrees that we're not going to re-create the rule on that because it's already addressed in the first, and those changes to the complaint aren't going to change the judge's rule. And so the final issue is I haven't heard anything to support that Paragraph 3 has a payment requirement. And if Paragraph 3, which says that nature has the right to repurchase by June 30th, under the 30th case, unequivocally, this court established that the general rule on options is payment is not a term of exercise. It is performance of the executory contract. There's some powerful language about it. Right? The Acton case was specifically provided and discussed as an exception to that rule. And I think that the critical thing is to look at the difference between the language in the contract, the action, in Burbank and the language in Acton and here. In Acton, the language that was required for the court to say clearly the action agreement makes payment a term of exercise. Thirdly, buyers shall exercise this option by giving seller notice and warning of his intention so to do, together with a certified or bank cashier's check paid into the order of whomever for $99,000. But that's not here. And I'm sorry, Rebecca, but now that you have your computer in front of you, tell us where in your second amendment complaint, which is the complaint on which Judge Schneider granted summary judgment against you, where is the claim that all we had to do was sign the repurchase agreement, we performed, they didn't breach? Tell me where is that? Because I have a real concern that you have forfeited that claim because it's not in your operative complaint. Your Honor, it's 100% correct that it's not. Again, we moved the leave to amend. Judge Schneider demanded the leave to amend because in the summary judgment decision, and if you've been reading the summary judgment decision, he addresses those arguments specifically. We amended the complaint, which includes now the count three and the amended complaint, absolutely includes all of that language. And the reason the parties didn't redo the summary judgment motion is because we all acknowledged that the judge's analysis on Exhibit B and whether or not that passage was exercised and the judge concluded, no, you had to pay by June 30th. That's how the judge interpreted paragraph three. And because of that, that's why we did not read the summary judgment motion. We brought those things in, but we didn't redo the summary judgment motion because the judge had already resolved those arguments on the second amendment related to the second amendment complaint. The arguments were made in the briefing on the summary judgment motion. Again, he ruled on that issue with respect to the first amended complaint. Correct? He granted summary judgment against you on the question of, we performed. And he held you did not perform. There was an order entered in November of some year. Correct? There was a prior summary judgment that he granted us leave to amend the complaint. He issued summary judgment against you on the breach of contract claim. He then gave you leave to amend. Yes, sir. You did amend by either filing the first or second amended complaint. The second amended complaint. That did not contain the allegations that you pled and lost in his earlier summary judgment claim. Correct? It's different, Your Honor. The original motion for summary judgment on the original complaint, I think it was on the first amended complaint, which all we had added was the first interference claim against LRC Investments. And on that complaint, the issue was that he did not believe we had pled at the anticipated repudiation argument. We did not have the Exhibit B arguments until... We had a breach of contract claim. Yes, sir. That said, we performed, they did not, they are in breach. He ruled by summary judgment, you did not perform. Right? He ruled against you. There was a final order. I mean, it was an interlocutory order. It was never, that count was never repled. Ever. When you filed your notice of appeal, you did not list the order where he granted summary judgment against you as an order that you are appealing. Is that correct? Yes, I know, Your Honor. The order that he granted summary judgment, he granted us leave to repled the count. And we did it. And we absolutely did it. Absolutely. Okay. The supplementary complaint is dramatically different than the complaint that summary judgment was granted on. Yes, you repled, but you didn't repled the count that you lost in order to preserve it for review on appeal. That's what you had to do, and I don't see that repled for purposes of appeal. We did repled the breach of contract, Your Honor. Under a different theory. Under the theory that we presented to the court, yes. Okay. That's your position. We'll take another look at it. Anything else you'd like to add? No, Your Honor. That's all that I have. Thank you. Very well. Okay. All the justices appreciate the efforts in this regard. Both parties did an excellent job in briefing. We'll take the matter under advisement. The court stands in recess.